Filed 10/7/13  P. v. Robledo CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H037979 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 210648) |
| v. | |
| ARTHUR ROBLEDO, | |
| Defendant and Appellant. | |

Arthur Robledo appeals from the February 16, 2012 order committing him as a sexually violent predator (SVP) for an indefinite term pursuant to Welfare and Institutions Code section 6600 et seq., the Sexually Violent Predator Act (SVPA or Act).[1] He mounts multiple constitutional attacks against the Act.

We find appellant's contentions without merit and affirm.

I

*Procedural History*

A petition to extend appellant's commitment as an SVP was filed on June 4, 2008.

On February 16, 2012, the jury found the petition alleging that appellant is an SVP within the meaning of section 6600 to be true.  That same day, the court ordered appellant

---

[1]    All further statutory references are to the Welfare and Institutions Code.

committed for an indeterminate term to the custody of the California Department of Mental Health for appropriate treatment and confinement. (§ 6604.)

Appellant filed a notice of appeal on February 17, 2012.

## II

### *Evidence*

The evidence is not relevant to appellant's constitutional claims and therefore it is not fully repeated here. We note briefly that it reflects that appellant, who was 60 years old at the time of trial, was diagnosed with pedophilia by both the People's experts. Appellant agreed with the diagnosis. Appellant had victimized many boys; he had previously admitted to as many as 150 victims. At trial, appellant estimated that he had about 25 to 30 victims. Some of his conduct led to convictions. He admitted to currently being sexually attracted to young boys.

Appellant had previously dropped out of sex offender treatment and he did not believe that he currently needed sex offender treatment. At the time of trial, he was not participating in such treatment.

In the opinions of the People's experts, appellant's pedophilia affected his ability to control his behavior and predisposed him to commit criminal sexual acts to an extent that makes him a menace to the health and safety of others. They both indicated that appellant was likely to commit sexually violent predatory offenses in the future.

## III

### *Discussion*

A. *Equal Protection*

Appellant maintains that persons committed under the SVPA are similarly situated to persons committed as mentally disordered offenders (MDO's) and persons initially committed after being found guilty by reason of insanity whose commitments are extended (NGI's). He argues that the Act denies equal protection of the law because it

2

provides for an indeterminate term of commitment and imposes a greater burden of proof for obtaining release as compared to those other statutory schemes.

In *People v. McKee* (2010) 47 Cal.4th 1172 (*McKee*), the California Supreme Court recognized that persons civilly committed as MDO's or NGI's are subject to short, definite terms of commitment whereas persons found to be SVP's are committed to an indeterminate term of commitment. (*People v. McKee*, *supra*, 47 Cal.4th at pp. 1202, 1207.) The court concluded that SVP's were similarly situated to these other groups of committees. (*Id.* at pp. 1204, 1207.) It remanded the matter to the trial court "to determine whether the People . . . can demonstrate the constitutional justification for imposing on SVP's a greater burden than is imposed on MDO's and NGI's in order to obtain release from commitment." (*Id.* at pp. 1208-1209, fn. omitted.) The trial court resolved this question in favor of the People on remand and its order was affirmed on appeal in *People v. McKee* (2012) 207 Cal.App.4th 1325 (*McKee II*). The Supreme Court denied review (S204503).

The Court of Appeal, Fourth District, Division One concluded in *McKee II* that "the trial court correctly found the People presented substantial evidence to support a reasonable perception by the electorate that SVP's present a substantially greater danger to society than do MDO's or NGI's, and therefore the disparate treatment of SVP's under the Act is necessary to further the People's compelling interests of public safety and humane treatment of the mentally disordered." (*Id.* at pp. 1330-1331.)

Appellant now contends that *McKee II* does not provide an adequate basis for rejecting his equal protection challenge. He disagrees with the Fourth District's analysis. He states that, "as a matter of law," the facts relied upon by the Fourth District "do not show a compelling state interest" justifying differential treatment of SVP's. He complains that *McKee II* failed to compare the general dangerousness of SVP's with the general dangerousness of MDO's and NGI's. He asserts that the Fourth District "did not engage in the comparison that is relevant to the equal protection challenge presented

3

here" because the court "focused exclusively upon the danger that . . . MDO's and NGI's might commit sex offenses . . . ."

Appellant suggests that *McKee II* also failed to consider the gravity of the danger presented by MDO's and NGI's. He asserts that the trauma suffered by victims of sexual offenses committed by SVP's should be compared to the "trauma experienced by victims of mayhem, arson, attempted murder, crimes of violence inflicting serious bodily injury and other offenses specified in subdivision (e) of Penal Code section 2962," which is part of the MDO law. Finally, appellant claims that the diagnostic and treatment differences identified by the Fourth District do not justify differential treatment of SVP's as compared to MDO's and NGI's.

We cannot say that *McKee II* reached the wrong result. Over a decade ago, the California Supreme Court recognized that "[t]he problem targeted by the [SVPA] is acute, and the state interests — protection of the public and mental health treatment — are compelling. [Citations.]" (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1153, fn. 20.) The evidence in *McKee II* of the persistence and pervasiveness of the paraphilia disorders usually suffered by SVP's and their lack of amenability to treatment must be regarded as particularly relevant to the SVPA's provision of an indeterminate term of commitment subject to a committee's petition for discharge in which the committee bears the burden of proof (§ 6608).

The Fourth District determined that there was "substantial evidence to support a reasonable perception by the electorate that SVP's have significantly different diagnoses from those of MDO's and NGI's, and that their respective treatment plans, compliance, and success rates are likewise significantly different." (*Id*. at p. 1347.) The distinctions made SVP's more difficult to treat and less likely to participate in treatment. (*Ibid*.) SVP's were "less likely to acknowledge there is anything wrong with them, and more likely to be deceptive and manipulative." (*Ibid*.)

4

The evidence discussed in *McKee II* indicated that "[o]nly 2 percent of MDO's and NGI's suffer from pedophilia or other paraphilias" whereas "nearly 90 percent of SVP's are diagnosed with pedophilia or other paraphilias." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1344.) "Dr. David Fennell, a psychiatrist and chief of forensics at Atascadero State Hospital, testified that about 90 percent of MDO and NGI patients suffer from a psychotic mental disorder" but "only 1 to 3 percent of SVP's suffer from a psychosis." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1344.)

There was also evidence that "[p]araphilia typically remains stable or constant throughout a patient's lifetime." (*Id*. at p. 1345.) "Although there may be an 'aging out' effect where patients' behavior or acting out on their fantasies is decreased as they age, that does not mean their urges and fantasies are similarly decreased. Patients with paraphilia generally have a specific intent in selecting victims (e.g., boys age seven to 10 years) and carefully plan and execute their offenses (e.g., by 'grooming' their victims before committing the offense). In contrast, patients with severe mental illnesses generally are not that organized and commit impulsive or opportunistic offenses." (*Ibid*.) It was "rare for a patient with a severe mental illness to sexually reoffend." (*Ibid*.)

The court summarized evidence regarding the significant differences in the treatment of severely mentally ill patients and patients with paraphilia. "Patients with severe mental illnesses generally are first treated with psychotropic medications and then with psychosocial support or intervention (e.g., therapy regarding communication skills, social skills, and problem solving). Their amenability to and compliance with treatment usually is very good. Most severely mentally ill patients are compliant with their medications and participate in treatment most of the time. In comparison, the treatment plans for patients with paraphilia generally involve psychosocial intervention-like treatment. Medications may decrease their sexual arousal, but not their deviant sexual interests. Treatment of paraphilia patients takes longer than for other patients because paraphilia is so pervasive, affecting their thoughts, beliefs, and interactions. . . . Also, a

5

higher percentage of SVP's (i.e., 10 to 15 percent) have antisocial or borderline personality disorders (i.e., involving pathological lying and instability, etc.) than do severely mentally ill patients, making their treatment more difficult.  Also, unlike severely mentally ill patients, 'not very many' SVP's are ready to work and participate in treatment."  (*Id*. at p. 1346.)

Dr. Fennell also provided testimony regarding the differences between treatment plans for SVP's and those for MDO's and NGI's.  (*Id*. at p. 1345.)  "MDO's, most of whom are housed at Atascadero, are overwhelmingly treated with psychotropic medications, resulting in their stabilization and amenability to psychosocial support treatment.  About two-thirds of MDO's and NGI's comply with their treatment programs, typically resulting in their decertification after about three years."  (*Id*. at pp. 1344-1345.)  In contrast, "SVP's treatment plans are not based on medications, but rather on giving them the tools to limit their risk of sexually reoffending."  (*Id*. at p. 1345.)  "The shortest time in which an SVP has completed treatment is two and one-half years.  Many other SVP's took up to five years to complete treatment."  (*Ibid*.)  But "only about 25 percent of SVP's participate in treatment."  (*Ibid*.)

*McKee II* also found that the People had "presented evidence that the victims of sex offenses suffer unique and, in general, greater trauma than victims of nonsex offenses."  (*Id*. at p. 1342.)  There was testimony that "[s]exual abuse causes the greatest trauma of adverse childhood experiences."  (*Ibid*.)  The court concluded that "there is substantial evidence to support a reasonable perception by the electorate, as a legislative body, that the harm caused by child sexual abuse and adult sexual assault is, in general, a greater harm than the harm caused by other offenses and is therefore deserving of more protection."  (*Id*. at pp. 1343-1344.)

*McKee II* acknowledged the People's evidence did not "show SVP's have, in fact, a higher sexual recidivism rate than MDO's and NGI's" as classes.  (*Id*. at p. 1342.)  But the

6

Static-99 evidence supported, "by itself, a reasonable inference or perception that SVP's pose a higher risk of sexual reoffending than do MDO's or NGI's." (*Ibid.*)

Appellant has not established that the Fourth's District's analysis is fatally defective because it did not compare the general danger presented by MDO's and NGI's with the general danger presented by SVP's or the trauma experienced by victims of those various groups. The SVPA targets the danger of sexual reoffense due to a mental disorder. There was a factual basis for the legislative body to believe that SVP's pose a special danger of sexual reoffense and the victims of these offenses suffered an especially acute injury. "[A]n equal protection violation does not occur merely because different statutory procedures have been included in different civil commitment schemes. (See *Hofferber*, *supra*, 28 Cal.3d 161, 172 [Legislature 'may adopt more than one procedure for isolating, treating, and restraining dangerous persons'].) Nothing compels the state 'to choose between attacking every aspect of a problem or not attacking the problem at all.' (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1312-1313.) Far from having to 'solve all related ills at once' (*People v. Cooper* (1996) 43 Cal.App.4th 815, 829), the Legislature has 'broad discretion' to proceed in an incremental and uneven manner without necessarily engaging in arbitrary and unlawful discrimination. (*People v. Ward* (2005) 36 Cal.4th 186, 217.)" (*People v. Barrett* (2012) 54 Cal.4th 1081, 1110.)

Further, while legislative distinctions among SVP's, MDO's, and NGI's must be "factually based," they need not be "incontrovertible or uncontroversial." (*McKee*, *supra*, 47 Cal.4th at pp. 1210-1211.) "Mere disagreement among experts will not suffice to overturn the Proposition 83 amendments." (*Id*. at p. 1210.) Appellant has not suggested that further adjudication of the equal protection issue would produce significantly different evidence.

As suggested by the evidence in *McKee II*, the differences in the length of commitment terms, the committees' entitlement to release, and the committees' burden of proof to obtain release are principally justified by differences in the diagnoses and

treatment of SVP's.  In light of the Supreme Court's clearly expressed intent to avoid an unnecessary multiplicity of proceedings with respect to equal protection challenges in SVP cases (see *People v. McDonald* (2013) 214 Cal.App.4th 1367, 1378; *People v. McKnight* (2012) 212 Cal.App.4th 860, 863-864), the Supreme Court's denial of review in *McKee II*, and our conclusions regarding the asserted flaws in *McKee II*, we find the equal protection arguments advanced in this appeal are without merit and do not require a remand for a further evidentiary hearing.

B.  *Ex Post Facto and Double Jeopardy Prohibitions*

Appellant argues that the SVPA violates the protection against double jeopardy provided by U.S. Constitution and the protections against ex post facto laws contained in both the U.S. and California Constitutions.  Appellant states that these argument are advanced purely to preserve these issues for review in federal court.  As appellant understands, this court is bound by *McKee*.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

In *Kansas v. Hendricks* (1997) 521 U.S. 346 [117 S.Ct. 2072], the U.S. Supreme Court made clear that a judicial determination that a law is not punitive "removes an essential prerequisite" for both double jeopardy and ex post facto claims.  (*Id*. at p. 370.) In *McKee, supra*, 47 Cal.4th 1172, the Supreme Court concluded:  "[T]he nonpunitive objectives of the Act—treatment for the individual committed and protection of the public—remain the same after Proposition 83.  Moreover, under the Act after Proposition 83, as before, a person is committed only for as long as he meets the SVP criteria of mental abnormality and dangerousness.  As such, the Proposition 83 amendments at issue here cannot be regarded to have changed the essentially nonpunitive purpose of the Act." (*Id*. at p. 1194.)  After considering "the seven-factor test articulated in *Kennedy v. Mendoza–Martinez* (1963) 372 U.S. 144, 168-169 . . . 83 S.Ct. 554"  (*id*. at p. 1195), the Supreme Court held that "the Proposition 83 amendments do not make the Act punitive

8

and accordingly do not violate the ex post facto clause." (*Ibid*.) This determination is dispositive of appellant's double jeopardy and ex post facto claims.

C. *Due Process*

1. *Indeterminate Term*

Appellant maintains that the SVPA violates due process by committing an SVP "indefinitely, subject to the individual proving by a preponderance of the evidence that he no longer meets the criteria for commitment." He argues that the California Supreme Court misunderstood *Jones v. United States* (1983) 463 U.S. 354 [103 S.Ct. 3043], which it cited in *McKee*.

In *McKee*, *supra*, 47 Cal.4th 1172, the California Supreme Court reasoned that an initial finding beyond a reasonable doubt that a person meets the definition of an SVP is "for present constitutional purposes, the functional equivalent of the NGI acquittal in *Jones* [*v. United States* (1983) 463 U.S. 354 [103 S.Ct. 3043].]" (*Id*. at p. 1191.) It determined that "as in *Jones*, the requirement that McKee, after his initial commitment, must prove by a preponderance of the evidence that he is no longer an SVP [on a petition under Welfare and Institutions Code 6608] does not violate due process." (*Ibid*.)

As to the summary denial of a frivolous petition under Welfare and Institutions Code section 6608, the Supreme Court stated in *McKee*: "A frivolous petition is one that 'indisputably has no merit.' (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 [defining frivolous appeals].) . . . The fact that the statute gives the court the authority to deny such petitions does not, of itself, serve as an obstacle to the primary due process goal of ensuring that only those individuals who continue to meet SVP criteria will remain involuntarily committed." (*McKee*, *supra*, 47 Cal.4th at p. 1192, fn. omitted.) It recognized that SVP committees are not precluded "from challenging an erroneous judicial determination that a petition is frivolous. [Citation.]" (*Id*. at p. 1192, fn. 6.)

In *McKee*, the Supreme Court recognized that "expert testimony is critical in an SVP commitment proceeding . . . ." (*Id*. at p. 1192.) It determined: "Given that the

denial of access to expert opinion when an indigent individual petitions on his or her own to be released may pose a significant obstacle to ensuring that only those meeting SVP commitment criteria remain committed, we construe section 6608, subdivision (a), read in conjunction with section 6605, subdivision (a), to mandate appointment of an expert for an indigent SVP who petitions the court for release."  (*Id.* at p. 1193.)

The Supreme Court observed:  "After Proposition 83, it is still the case that an individual may not be held in civil commitment when he or she no longer meets the requisites of such commitment.  An SVP may be held, as the United States Supreme Court stated under similar circumstances, 'as long as he is both mentally ill and dangerous, but no longer.' (*Foucha v. Louisiana* (1992) 504 U.S. 71, 77 [ . . . 112 S.Ct. 1780].)"  (*McKee, supra*, 47 Cal.4th at p. 1193.)  It held that the amended SVPA, as construed, "does not violate the due process clause."  (*Ibid.*)

Since this court is bound by *McKee* (*Auto Equity Sales, Inc. v. Superior Court*, *supra*, 57 Cal.2d at p. 455), we must reject appellant's due process contention concerning the indeterminate term of commitment and burden of proof for release imposed on SVP's.

2. *Likelihood of Reoffense*

Section 6600, subdivision (a), defines an SVP as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is *likely* that he or she will engage in sexually violent criminal behavior." (Italics added.)  Appellant argues that the statutory phrase "likely [to] engage in sexually violent criminal behavior" (§ 6600, subd. (a)), as construed in *People v. Roberge* (2003) 29 Cal.4th 979 (*Roberge*), unconstitutionally permits the trier of fact to "make a finding of 'likely' based not on probability but rather on the quality of the possible harm and quality of the evidence" and, thereby, violates due process.

In *Roberge*, the California Supreme Court held that the phrase "likely [to] engage in sexually violent criminal behavior" required proof that the person presented "a

10

*substantial danger*, that is, *a serious and well-founded risk*, of committing such crimes if released from custody." (*Id*. at p. 988.) The Supreme Court relied extensively on its prior opinion in *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888 (*Ghilotti*), which considered the phrase "*likely* to engage in acts of sexual violence without appropriate treatment and custody" (italics added), as used in section 6601, subdivision (d), concerning prepetition evaluations.

In *Ghilotti*, the Supreme Court first addressed the contention of Ghilotti and his amici curiae that " 'likely,' as used in [that] context, means 'highly likely,' or at least 'more likely than not.' " (*Ghilotti*, *supra*, 27 Cal.4th at p. 915.) In interpreting that language, the Supreme Court observed that "the word 'likely,' when used in [that] context, must be given a meaning consistent with the statute's clear overall purpose." (*Id*. at p. 921.) "That purpose is to protect the public from that limited group of persons who were previously convicted and imprisoned for violent sex offenses, and whose terms of incarceration have ended, but whose current mental disorders so impair their ability to control their violent sexual impulses that they *do in fact* present a high risk of reoffense if they are not treated in a confined setting." (*Ibid*.) The court also recognized that "[t]he word 'likely,' as used in the statute, also must be construed in light of the 'difficulties inherent in predicting human behavior' (*Hubbart*, *supra*, 19 Cal.4th 1138, 1163 . . . ), particularly in mathematical terms." (*Ibid*.)

In *Ghilotti*, the court then construed the statutory language at issue as follows: "[T]he phrase . . . connotes much more than the mere *possibility* that the person will reoffend as a result of a predisposing mental disorder that seriously impairs volitional control. On the other hand, the statute does not require a precise determination that the chance of reoffense is *better than even*. Instead, an evaluator applying this standard must conclude that the person is 'likely' to reoffend if, because of a current mental disorder which makes it difficult or impossible to restrain violent sexual behavior, the person presents a *substantial danger,* that is, a *serious and well-founded risk,* that he or she will

11

commit such crimes if free in the community."  (*Id*. at p. 922.)  It pointed out that "[t]his interpretation of 'likely,' requiring *substantial danger* of new acts of sexual violence arising from the offender's current mental disorder, is consistent with the standards used by the Legislature in other current and past statutes to justify the extended confinement and treatment of convicted offenders who, after their maximum periods of incarceration, remain dangerous as the result of mental diseases, defects, or disorders.  [Citations.]"  (*Ibid*.)

The Supreme Court next reached the claim that "constitutional principles of substantive due process, as applicable to involuntary civil commitment statutes, require a limitation of such commitments to persons who are 'highly likely' to reoffend."  (*Ghilotti*, *supra*, 27 Cal.4th at p. 923.)  It rejected this contention.

It stated:  "As we pointed out in *Hubbart*, *supra*, 19 Cal.4th 1138 . . . , '[w]hile due process precludes the involuntary commitment of mentally impaired persons who are not in any sense "dangerous" [citation], the United States Supreme Court has never directly defined the term.'  (*Id*., at p. 1161 . . . .)  Indeed, we indicated, '[c]ivil commitment statutes have long been upheld where dangerousness is expressed in terms of a "probability," "threat," or similar risk that a person who is presently mentally disturbed will inflict harm upon himself or others in the future if not confined.  (*Heller* [*v. Doe*] [(1993)] 509 U.S. 312, 317–318 [113 S.Ct. 2637, 125 L.Ed.2d 257] [mentally retarded and mentally ill persons who pose " 'a danger or a threat of danger' " to self or others]; *Allen v. Illinois* (1986) 478 U.S. 364, 366, fn. 1 [106 S.Ct. 2988, 92 L.Ed.2d 296] [mentally disordered sex offender with " 'criminal propensities to the commission of sex offenses' "] . . . ; *Greenwood v. United States* [(1956)] 350 U.S. 366, 368, fn. 3 [76 S.Ct. 410, 100 L.Ed. 412] [mentally incompetent prisoners who " 'will probably endanger the safety' " of others]; see *Minnesota v. Probate Court* (1940) 309 U.S. 270, 273-274 [60 S.Ct. 523, 84 L.Ed. 744] [statute providing for commitment of sexual psychopaths is

construed to apply to habitual sex offenders who are " 'likely to attack' " or injure others].)' (*Hubbart*, *supra*, at p. 1163, fn. 26 . . . .)" (*Id*. at pp. 923-924.)

The Supreme Court explained in *Ghilotti*: "[W]e do not discern that due process limits the involuntary civil commitment of dangerous mentally disordered offenders only to those persons who are more likely than not to reoffend. In our view, the state has a compelling protective interest in the confinement and treatment of persons who have already been convicted of violent sex offenses, and who, as the result of current mental disorders that make it difficult or impossible to control their violent sexual impulses, represent a *substantial danger* of committing similar new crimes [citations], even if that risk cannot be assessed at greater than 50 percent." (*Id*. at p. 924.)

Faced with a substantive due process challenge, the Supreme Court in *Ghilotti* construed the nature of the risk required by section 6601 and concluded that a higher standard was not demanded by due process. The Supreme Court impliedly concluded that its interpretation comported with substantive due process. The court subsequently adopted that same construction with regard to the definition of an SVP used at trial. (*People v. Roberge*, *supra*, 29 Cal.4th at p. 988.)

Appellant has not cited any case establishing that substantive due process requires the extent of future danger posed by a proposed committee to be mathematically quantifiable or expressed as a specific probability. The analysis in *Ghilotti* is persuasive authority that *Roberge*'s interpretation of the likelihood required by section 6000, subdivision (a), does not contravene due process.

3. *Void For Vagueness Doctrine*

Appellant asserts that the SVPA violates due process under the void for vagueness doctrine because section 6600, subdivision (a), as judicially interpreted in *Roberge*, *supra*, 29 Cal.4th 979, does not set "minimum standards to guide the interpretation of the evidence by jurors" and "leaves to the jury the task of setting a threshold risk of reoffense." He states: "[W]hether any danger is 'serious,' whether it is 'substantial,'

13

whether it is 'well-founded' are matters of interpretation. They are matters upon which the minds of individual jurors might vary widely. They are matters upon which the minds of expert witnesses might vary widely even if they view the evidence to be exactly the same. The use of these terms effectively leaves the application of the statute to the individual predilections of the jurors."

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that [a person] is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." (*Grayned v. City of Rockford* (1972) 408 U.S. 104, 108-109, fns. omitted [92 S.Ct. 2294].) "[A] law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case. See, e.g., *Lanzetta v. State of New Jersey*, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888; *Baggett v. Bullitt*, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377." (*Giaccio v. State of Pa.* (1966) 382 U.S. 399, 402-403 [86 S.Ct. 518].)

Due process, however, does not require exactitude. As the U.S. Supreme Court has recognized, "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." (*Grayned v. City of Rockford, supra,* 408 U.S. at p. 110.) "[T]his prohibition against excessive vagueness does not invalidate every statute which a reviewing court believes could have been drafted with greater precision. Many statutes

14

will have some inherent vagueness, for '(i)n most English words and phrases there lurk uncertainties.' *Robinson v. United States*, 324 U.S. 282, 286, 65 S.Ct. 666, 668, 89 L.Ed. 944 (1945)." (*Rose v. Locke* (1975) 423 U.S. 48, 49-50 [96 S.Ct. 243].) Due process requires only reasonable specificity or reasonable certainty. (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1117.)

In *People v. Morgan* (2007) 42 Cal.4th 593, the California Supreme Court determined that "in the context of our simple kidnapping statute, where the adjective 'substantial' modifies the noun 'distance,' the word 'substantial' means a 'significant amount' as contrasted with a distance that is 'trivial,' and that the phrase 'substantial distance' meets the constitutional requirement of reasonable certainty." (*Id*. at pp. 606-607.) It stated: " 'The law is replete with instances in which a person must, at his peril, govern his conduct by such nonmathematical standards as "reasonable," "prudent," "necessary and proper," "substantial," and the like. Indeed, a wide spectrum of human activities is regulated by such terms: thus one man may be given a speeding ticket if he overestimates the "reasonable or prudent" speed to drive his car in the circumstances (Veh.Code, § 22350), while another may be incarcerated in state prison on a conviction of wilful homicide if he misjudges the "reasonable" amount of force he may use in repelling an assault [citation]. As the Supreme Court stated in *Go–Bart Importing Co. v. United States* (1931) 282 U.S. 344, 357[, 51 S.Ct. 153, 75 L.Ed. 374], "There is no formula for the determination of reasonableness." Yet standards of this kind are not impermissively vague, provided their meaning can be objectively ascertained by reference to common experiences of mankind.' (*People v. Daniels* (1969) 71 Cal.2d 1119, 1128-1129 . . . .)" (*Id*. at p. 606.)

In *State of Minnesota ex rel. Pearson v. Probate Court of Ramsey County* (1940) 309 U.S. 270 [60 S.Ct. 523], the U.S. Supreme Court rejected a due process vagueness challenge to Minnesota's sexual psychopath law. (*Id*. at p. 274.) The phrase "psychopathic personality" was statutorily defined to mean " 'the existence in any person

15

of such conditions of emotional instability, or impulsiveness of behavior, or lack of customary standards of good judgment, or failure to appreciate the consequences of his acts, or a combination of any such conditions, as to render such person irresponsible for his conduct with respect to sexual matters and thereby dangerous to other persons.' " (*Id*. at p. 272.) The Minnesota Supreme Court had determined that this language was " '. . . intended to include those persons who, by a habitual course of misconduct in sexual matters, have evidenced an utter lack of power to control their sexual impulses and who, as a result, are *likely* to attack or otherwise inflict injury, loss, pain or other evil on the objects of their uncontrolled and uncontrollable desire. . . .' " (*Id*. at 273, italics added.)

In deciding the constitutional questions before it, the U.S. Supreme Court took "the statute as though it read precisely as the highest court of the State has interpreted it. [Citations.]" (*Ibid*.) It concluded: "This construction of the statute destroys the contention that it is too vague and indefinite to constitute valid legislation. There must be proof of a 'habitual course of misconduct in sexual matters' on the part of the persons against whom a proceeding under the statute is directed, which has shown 'an utter lack of power to control their sexual impulses', and hence that they 'are likely to attack or otherwise inflict injury, loss, pain or other evil on the objects of their uncontrolled and uncontrollable desire.' These underlying conditions, calling for evidence of past conduct pointing to probable consequences, are as susceptible of proof as many of the criteria constantly applied in prosecutions for crime. [Citations.]" (*Id*. at p. 274.)

Appellant has failed to persuade us that the definition of an SVP under section 6600, subdivision (a), as construed by the California Supreme Court in *Roberge*, *supra*, 29 Cal.4th 979, is unconstitutionally vague.

## DISPOSITION

The February 16, 2012 order of commitment is affirmed.

16

_____

ELIA, J.

WE CONCUR:



_____

RUSHING, P. J.



_____

PREMO, J.


17